# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RICHARD LEE RADCLIFFE,

        Defendant-Appellant.

UNPUBLISHED
June 2, 2015

No. 319175
Grand Traverse Circuit Court
LC No. 13-011634-FC

Before: BORRELLO, P.J., and KRAUSE and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of two counts of assault with intent to commit murder (AWIM), MCL 750.83, three counts of assault with a dangerous weapon (felonious assault), MCL 750.82, one count of discharging a firearm in an occupied structure, MCL 750.234b(2), and one count of using a firearm during the commission of a felony (felony-firearm) MCL 750.227b(1). Defendant was acquitted of one count of AWIM, MCL 750.83 and one count of possession of a firearm under the influence, MCL 750.237. The court sentenced defendant to concurrent prison sentences of 285 months to 50 years' for the AWIM convictions, 32 to 48 months for the felonious assault convictions, and 2 to 4 years' for discharging a firearm in an occupied structure. These sentences were to be served consecutive to a two-year term for the felony-firearm conviction. For the reasons set forth in this opinion, we affirm defendant's convictions and sentences and remand for the ministerial task of correcting the sentencing information report.

## I. FACTS

On April 7, 2013, William Richard went to check on his stepfather, defendant Richard Radcliffe. William explained that defendant had medical issues, and William, who lived in a camper behind defendant's trailer, checked in on defendant daily. When defendant did not answer his phone or respond when William knocked on the door, William became concerned and entered the trailer. William said he went into defendant's bedroom and found defendant lying on the bed with a rifle next to him. William testified that defendant was upset and said something about wanting to die. There was testimony that defendant's step-grandson, Cody, had just called defendant and told him he was coming over to kill him. William became concerned that defendant would hurt himself and was also afraid that defendant might fire the gun. William testified that when he mentioned the police, defendant said to him that "it would be suicide by

-1-

cop" if the police came to the house. William left the bedroom and called defendant's mother, Bernice Radcliffe, and told her about his concerns. A recording of a 911 call was played for the jury wherein Bernice stated that defendant would shoot at the police if they came over. When William was in the kitchen, he heard the gun go off in defendant's bedroom. William ran outside.

A number of officers responded to the 911 call including Conservation Officer Sean Kehoe and Sheriff Deputies Matt Jerome, Brian Giddis and Kirk Parker. Kehoe testified that he heard the 911 call reporting gunfire over the radio and drove his patrol truck to defendant's residence, 1674 Sunburst Street, to provide backup. There, he met up with Jerome, Giddis and Parker. The officers took up a position at a nearby intersection to stop traffic and plan their approach. The officers saw a man standing in the road talking on a cell phone in front of the house. At approximately the same time, Deputy Justin Revnell, who was en route to the scene, was speaking on the phone to defendant. Revnell used his personal cell phone to call the number that his computer showed was the phone number listed for 1674 Sunburst. Although it was in fact defendant whom Revnell was speaking to, Revnell testified that defendant identified himself as William Richard and indicated that he was going outside. Revnell heard information over the radio that officers at the scene had observed a man standing outside the house talking on the phone. Revnell said that he asked defendant what he was wearing, and defendant indicated that he was wearing a black sweatshirt. Revnell testified that defendant told him that he was alone at the residence.

Based on information relayed by Revnell over the radio, Kehoe, Parker and Jerome decided to approach the man in the road whom they believed to be the suspect. Kehoe explained the events that transpired next. Kehoe explained that he slowly drove his patrol truck to near where the man was standing while Parker and Jerome used the passenger-side of the truck for cover. Giddis followed in his police car. When they got close, the man in the road put his hands up and complied with the directions of the officers. It was decided that Jerome would leave the cover of the truck and get "hands on" the suspect while Parker provided cover. Just as Jerome was about to reach the suspect, the officers heard gunshots. Jerome dove for cover behind the truck. At the time of the shooting, Kehoe was standing between the driver-side front door of the pickup and the frame providing cover for the other two officers. Kehoe estimated the patrol truck was about 40 or 50 yards away from the front of the trailer home. Kehoe got down on one knee and surveyed the area and saw a man inside the front door of the trailer holding a gun. The man then disappeared inside the trailer.

Giddis testified that he saw defendant on the front steps of the trailer holding a gun. Giddis testified that the gun was pointed at the officers. When defendant started shooting, Giddis put his car in reverse and backed away 100 feet. Giddis testified that he felt like he was being ambushed. Giddis got out of the car to retrieve his rifle. When he looked back at the trailer, it appeared that the shooter had gone back inside.

Sheriff's Sergeant Greg McManey, who had also responded to the 911 call, saw defendant on the porch with the rifle pointed toward the deputies and officer Kehoe. McManey shot back at defendant with his rifle. McManey testified that within five seconds, defendant stopped shooting and retreated into the house. McManey then observed Deputy Anthony Romanowski approaching the front door of the trailer.

Romanowski testified that he approached the front door of the trailer and observed that defendant no longer had the gun in his hands. Romanowski quietly approached the ramp leading into the trailer and then ran forward and tackled defendant.

McManey went across the street to check on the neighbors. He observed four bullet holes in the trailer home across the street that went into the home and penetrated the refrigerator and kitchen cabinets. Lance Reed and his wife were at home at the time and Reed was in the kitchen cooking dinner. McManey testified that there was a direct line of site from the front door of defendant's trailer over the top of Kehoe's pickup to where the bullet holes entered Reed's house. Using the holes as a reference, police investigator Jerry Hilborn mapped the trajectory of the bullets and concluded that the bullets traveled 6.5, 7.3, 8.8, and 9.7 feet above the ground. The prosecution presented an exhibit that showed that the bullets traveled directly over Kehoe's patrol truck. In addition, a firearms expert testified that defendant used a semi-automatic rifle, similar in characteristics to an AK-47.

Defendant was convicted and sentenced as set forth above and he appeals as of right.

## II. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to support his two convictions of AWIM and his conviction of discharging a firearm in an occupied structure.

We review de novo a challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "The test for determining the sufficiency of evidence in a criminal case is whether the evidence, viewed in a light most favorable to the people, would warrant a reasonable juror in finding guilt beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 399; 614 NW2d 78 (2000). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id.* (quotations omitted).

Defendant was charged with three counts of AWIM, Count I concerned Officer Kehoe, Count II concerned Deputy Jerome and Count III concerned Deputy Parker. The jury convicted defendant of Counts I and III and acquitted defendant of Count II.[1]

"[T]he elements of AWIM . . . are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014) (quotation marks omitted). Defendant contends that there was insufficient evidence to prove that he had an actual intent to kill Kehoe or Parker. "[I]ntent may be inferred from circumstantial evidence." *Id.* at 11. "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind." *Id.* "Intent to kill may be

---

[1] In his brief on appeal, defendant erroneously contends that he was convicted of Counts I and II.

inferred from all the facts in evidence, including the use of a deadly weapon." *Id.* In this case, viewed in a light most favorable to the prosecution, a reasonable juror could have concluded beyond a reasonable doubt that defendant acted with intent to kill Kehoe and Parker. *Nowack*, 462 Mich at 399.

The evidence at trial showed that defendant spoke on the telephone with a responding officer and led police to believe that he was William. Then, defendant waited to shoot four shots at Kehoe and Parker after they stopped their vehicle 40 to 50 yards from the front of defendant's house to apprehend William. This evidence supported the inference that defendant led the officers into a ruse so that he could shoot at them when they were within range. Moreover, defendant used a high-powered semi-automatic rifle to shoot multiple rounds at Kehoe and Parker. See *People v Ray*, 56 Mich App 610; 615; 224 NW2d 735 (1974) ("The use of a lethal weapon will support an inference of an intent to kill.")

In addition, evidence showed that defendant's mother informed the 911 operator that defendant would shoot at officers if they approached the home and that defendant stated it would be "suicide by cop" if police appeared at his residence. This evidence would have allowed the jury to infer that defendant shot with intent to kill both officers. See *Henderson*, 306 Mich App at 9 ("intent may be inferred from circumstantial evidence.") Furthermore, the evidence showed that one of the bullets traveled at 6-feet-5-inches from the ground. The bullet was merely three inches above Kehoe, who stood 6-foot-2-inches. While defendant maintains on appeal that his intent was not to kill the officers, but rather to commit "suicide by cop," intent to be killed is not inconsistent with intent to kill others. Even if defendant's actions were motivated by a suicidal desire, he could have formed the intent to kill the officers at the same time. In short, the record evidence supports that a reasonable juror could have concluded beyond a reasonable doubt that defendant intended to kill Kehoe and Parker. Therefore, there was sufficient evidence to support defendant's convictions of AWIM as to Counts I and III.

Defendant also contends there was insufficient evidence to support his conviction of discharging a firearm in an occupied structure.

At the time of defendant's conviction, MCL 750.234b(2) provided in relevant part as follows:[2]

> An individual who intentionally discharges a firearm in a facility that he or she has reason to believe is an occupied structure in reckless disregard for the safety of any individual is guilty of a felony. . . .

The trial court instructed the jury that the prosecutor needed to prove the following elements beyond a reasonable doubt to sustain a conviction under this statute:

> First, that the defendant intentionally discharged a firearm.

---

[2] MCL 750.234b(2) was amended effective September 22, 2014. 2014 PA 191.

Second, that the defendant discharged the firearm in an occupied structure.

Third, that the defendant knew or had reason to know when he discharged the firearm that the structure was then occupied

Fourth, that the defendant discharged the firearm in reckless disregard for the safety of any person.

An occupied structure means a facility in which one or more individuals are present.

On appeal, defendant challenges the evidence with respect to the fourth element, arguing that there was insufficient evidence to prove that he discharged his firearm in reckless disregard for the safety of any person.

At trial, William testified that he went to check on defendant, his step-father, and found him lying on his bed with a "military style . . . automatic type rifle" by his side. William testified that he was standing about a foot inside defendant's bedroom. William became concerned that defendant was going to shoot the rifle "because he had it in his hand and he pointed it up towards the ceiling." William testified, "When he started raising the gun I turned around and booked it out." William heard the gun discharge when he was in the kitchen. This evidence would have allowed a rational jury to conclude beyond a reasonable doubt that defendant fired a gun in reckless disregard for the safety of a person—i.e. William. Specifically, defendant fired a high-powered assault rifle immediately after William left his bedroom. William was still in the trailer home at the time defendant shot the gun. Irrespective of whether defendant pointed the gun at the ceiling, firing a high-powered rifle in an enclosed area occupied by another person is sufficient proof that defendant acted with reckless disregard for the safety of that person.

## B. SENTENCING

Defendant contends that the trial court erred in scoring offense variable (OV) 6 (premeditation), OV 8 (asportation of a victim), OV 10 (exploitation of a vulnerable victim), and OV 12 (contemporaneous felonies).

This Court has previously explained the applicable standard of review as follows:

Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citations omitted).]

MCL 777.36 governs the scoring of OV 6 and provides that 50 points should be scored in relevant part where "[t]he offender had premeditated intent to kill. . . ." MCL 777.36(1)(a). OV 6 should be scored at 25 points where "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). Premeditation is not

-5-

defined for the purpose of the offense variable statute, but "[p]remeditation and deliberation, for purposes of a first-degree murder conviction, require sufficient time to allow the defendant to take a second look." *People v Orr*, 275 Mich App 587, 591; 739 NW2d 385 (2007) (quotations omitted).

In assessing 50 points for OV 6, the trial court explained as follows:

> The defendant, while inside his home talking to a police officer, masqueraded as the son-in-law who was actually out in the driveway, he went so far as to describe himself as being dressed in the clothing that the son-in-law was wearing and therefore was implying he was ready to give up. So, the officers went to approach the son-in-law to apprehend him and that brought them into a clear opportunity which the defendant then used to shoot at them with a high powered rifle and that's a lot of planning and doesn't have to be planned days in advance and may only be planned for five minutes. It was an executed plan to murder these people and that's premeditation.

Defendant contends that OV 6 should have been scored at 25 points because there was no evidence to support a finding of premeditation. The trial court did not clearly err in finding that there was evidence to support premeditation and this finding was supported by a preponderance of the evidence. *Hardy*, 494 Mich at 438. Evidence showed that defendant deceived police into thinking he was the man standing outside the home waiting to be apprehended. Defendant waited until one of the deputies broke cover from the patrol truck before he opened fire with a high-powered rifle. Defendant's actions evinced planning—even if the plan was developed over a course of a few minutes and the timing of the events as they transpired were sufficient to allow defendant to take a second-look to consider his actions. *Orr*, 275 Mich App at 591.

Defendant challenges the scoring of OV 8. MCL 777.38 governs the scoring of OV 8 and directs the court to assess 15 points when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense. . . ." MCL 777.38(1)(a). The statute directs the court to assess zero points when "[n]o victim was asported or held captive." MCL 777.38(1)(b). "Asportation does not require force; asportation for the purpose of OV 8 may occur even when the victim voluntarily accompanied the defendant to a place or situation of greater danger." *People v Dillard*, 303 Mich App 372, 379; 845 NW2d 518, 522 (2013). However, asportation must involve some movement of the victim that "is not merely incidental" to the commission of the underlying offense. *People v Spanke*, 254 Mich App 642, 647; 658 NW2d 504 (2003).

The trial court scored OV 8 at 15 points, explaining as follows:

> Didn't he lure them from a safe position to out in the open at close range by masquerading as the son-in-law and luring the officers into this place of greater danger? He didn't actually physically grab them and take them to a place of greater danger, but he lured them there.

The trial court clearly erred in finding that defendant asported a victim in this case. *Black's Law Dictionary* (10th ed) defines "asportation" as "[t]he act of carrying away or

removing" and asportation for purposes of OV 8 requires some type of movement that is not merely incidental to commission of the crime. *Spanke*, 254 Mich App at 647. Here, defendant did not carry away or move any of the officers and the officers did not accompany defendant to a place of greater danger. See *Dillard*, 303 Mich App at 379. Defendant did not call the officers to his home, but rather was resistant to William and his mother calling the police to the scene. The police arrived at the scene on their own accord. Defendant did not move them to the location or move them once they were at the location. Accordingly, the trial court clearly erred in scoring OV 8 at 15 points. However, as explained in more detail below, the scoring error did not alter the recommended minimum sentencing range and defendant is not entitled to resentencing.

Defendant contends that the trial court erred in scoring OV 10 at 15 points. MCL 777.40 governs the scoring of OV 10 and directs the sentencing court to assess 15 points where "[p]redatory conduct was involved." MCL 777.40(1)(a). "Predatory conduct" is defined as "preoffense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization." MCL 777.40(3)(a).

The trial court assessed 15 points for OV 10, explaining in relevant part as follows:

> I think the caption is probably not part of the requirement, and if it were I guess I would say I don't care how big and tough you are if you are out in the open and someone is hiding and has a high powered rifle pointed at you, you are vulnerable. If that was the case, we would still say they are vulnerable victims, but because of conduct of luring these officers out in the open at close range that is predatory conduct, it's pre-offense conduct for the primary purpose of trying to kill the officers.

Defendant contends that there was no evidence to support that he engaged in "predatory conduct." This argument lacks merit.

MCL 777.40(1)(a) does not require that the victim have any particular vulnerability—it only requires that "predatory conduct" be involved. The victim need not have any inherent vulnerability. *People v Kosik*, 303 Mich App 146, 161; 841 NW2d 906 (2013). Rather, the susceptibility can arise from external circumstances such that "a defendant's 'predatory conduct,' by that conduct alone *(eo ipso)*, can create or enhance a victim's 'vulnerability.'" *People v Huston*, 489 Mich 451, 468; 802 NW2d 261 (2011).

"[P]redatory conduct under the statute is behavior that is predatory in nature, precedes the offense, and is directed at a person for the primary purpose of causing that person to suffer from an injurious action." *Kosik*, 303 Mich App at 160 (internal quotation and alteration marks omitted).

> However, predatory conduct does not encompass any preoffense conduct, but rather only those forms of preoffense conduct that are commonly understood as being predatory in nature . . . as opposed to purely opportunistic criminal conduct or preoffense conduct involving nothing more than run-of-the-mill

planning to effect a crime or subsequent escape without detection. [*Id.* (internal quotation and alteration marks omitted).]

In *Kosik*, this Court held that the trial court properly found predatory conduct where the defendant "investigat[ed] the store and wait[ed] until the victim was alone to strike." *Id.* In *Huston*, 489 Mich at 463, our Supreme Court stated that "lying in wait constitutes quintessential 'predatory conduct.'" The Court stated, "In this case, before the robbery, defendant laid in wait while armed and hidden from view for the primary purpose of eventually causing a person to suffer from an injurious action, i.e., an armed robbery." *Id.* at 463-464.

Defendant's actions in this case are akin to lying in wait. Defendant chose to lure the police into a vulnerable position before attempting to shoot them with his rifle. This was not "purely opportunistic criminal conduct." *Kosik*, 303 Mich App at 160. Rather, defendant created and waited for the opportunity to strike at the police. The trial court did not clearly err in scoring OV 10.

Finally, defendant contends that the trial court erred in scoring OV 12 at 5 points.

A sentencing court must assess 5 points for OV 12 where either "[o]ne contemporaneous felonious criminal act involving a crime against a person was committed" or "[t]wo contemporaneous felonious criminal acts involving other crimes were committed." MCL 777.42(1)(d) (e).

A felonious criminal act is contemporaneous if both of the following circumstances exist:

(i) The act occurred within 24 hours of the sentencing offense.

(ii) The act has not and will not result in a separate conviction. [MCL 777.42(2)(a).]

The trial court did not articulate any rationale for scoring OV 12 at five points and there is no evidence on the record to support that defendant committed a contemporaneous criminal act separate and apart from the charged offenses. Accordingly, OV 12 should have been scored at zero points.

In sum, the trial court did not err in scoring OV 6 at 50 points or in scoring OV 10 at 15 points. However, the trial court clearly erred in assessing 15 points for OV 8 and in assessing 5 points for OV 12. Nevertheless, defendant is not entitled to resentencing. Defendant's sentencing offense (AWIM) is a Class A offense. MCL 777.16d. Defendant's PRV score was 30 for a PRV Level D and his total OV score was 165 for an OV Level VI; defendant's recommended minimum sentencing range was 171 to 285 months. See MCL 777.62. Reducing defendant's OV score by 20 points from 165 to 145 leaves him with a total OV Level VI and his recommended minimum sentencing range remains 171 to 285 months. MCL 777.62. Therefore, resentencing is not warranted. *People v Francisco*, 474 Mich 82, 89 n 8, 711 NW2d 44 (2006) ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required.") However, remand for correction of the sentencing information report to reflect the proper scoring of the OVs is warranted.

Defendant raises a constitutional issue with respect to the trial court's scoring of OV 6, OV 8 and OV 10, arguing that the court scored these variables based on judicially found facts in violation of his constitutional rights under the United States Supreme Court's decision in *Alleyne v United States*,___US___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), which requires that a jury make all findings of fact used to impose a mandatory minimum sentence. Defendant acknowledges that under *People v Herron*, 303 Mich App 392, 404; 845 NW2d 533 (2013) leave to appeal held in abeyance ___Mich___; 846 NW2d 924 (2014), a sentencing court can make findings of fact which increase a defendant's minimum sentencing range under the guidelines. However, defendant notes that on June 11, 2014, our Supreme Court granted leave in *People v Lockridge*, 496 Mich 852; 847 NW2d 925 (2014) to determine:

> [W]hether a judge's determination of the appropriate sentencing guidelines range, MCL 777.1, *et seq.*, establishes a 'mandatory minimum sentence,' such that the facts used to score the offense variables must be admitted by the defendant or established beyond a reasonable doubt by the trier of fact, [*Alleyne*, 570 US at ___]. [*Lockridge*, 496 Mich at 852.]

In *Herron*, 303 Mich App at 392, this Court held that *Alleyne* does not implicate Michigan's sentencing scheme. Although that issue is currently pending before our Supreme Court, *Herron* remains binding precedent on this Court and must be followed. See MCR 7.215(J)(1). Defendant's argument therefore is without merit.[3]

Affirmed and remanded for correction of the sentencing information report consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Michael J. Riordan

---

[3] Moreover, even assuming that defendant prevailed on his constitutional argument, he would not be entitled to resentencing. Defendant contends that judicial fact finding resulted in 25 additional points being assessed to OV 6 for premeditation and 15 points being assessed to OV 10 for predatory conduct. Even if we were to agree with defendant, reducing defendant's total OV score by an additional 40 points would leave him with a total OV score of 105, which remains an OV Level VI and his recommended minimum sentencing range would remain 171 to 285 months. See MCL 777.62. Accordingly, defendant would not be entitled to resentencing. See *Francisco*, 474 Mich at 89 n 8.